# IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN SOUTHERN DIVISION

| | |
|---|---|
| ERIC WILLIAMS, | ) |
| | ) |
| PLAINTIFF, | ) |
| | ) CIVIL ACTION NO. |
| VS. | ) |
| | ) |
| AK STEEL CORPORATION, | ) HON. |
| | ) |
| DEFENDANTS. | ) |
| | ) |

## COMPLAINT

PLAINTFF, ERIC WILLIAMS, by and through his attorneys, CARLA D. AIKENS, P.C., submits the following Complaint against DEFENDANT, AK STEEL CORPORATION.

## JURY DEMAND

COMES NOW PLAINTIFF, ERIC WILLIAMS, and hereby makes his demand for trial by jury.

## JURISDICTION

1. At all times relevant to this action Mr. Williams was a resident of the State of Michigan.

2. Defendant is a domestic profit corporation, which has a continuous and systematic place of business at 14661 Rotunda Dr, Dearborn, MI 48120.

3. All relevant actions giving rise to this complaint took place in Wayne County, Michigan.

4. This action is brought in this Court on the basis of federal question jurisdiction, pursuant to Title VII of the Civil Rights Act of 1964, 42 USC 2000e et seq.

5. Pursuant to 28 U.S.C. §1367, this Court has supplemental jurisdiction over Mr. William's state law claims.

## VENUE

6. Venue is proper in the Eastern District of Michigan pursuant to Section 706(f)(3) of Title VII, 42 U.S.C. § 2000e-5(f)(3), because the unlawful employment discrimination giving rise to Mr. Williams' claims occurred in this District.

## STATEMENT OF FACTS

7. Mr. Williams was hired by Rouge Steel Company on May 30, 1995.

8. Mr. Williams began working for Defendant on September 16, 2014, when Defendant purchased the facility where Mr. Williams was employed.

9. Mr. Williams was successful at his job and held this position continuously for over twenty years since he was eighteen years old.

10. Over the last ten years, excluding the write-ups in controversy by Supervisor David Klein, as noted below, Mr. Williams has only been reprimanded a single time.

11. As soon as Defendant took over the facility in 2014, the safety procedures drastically changed.

12. Instead of receiving direct training and supervision on how to use the specific heavy machinery, employees began to receive numerous pamphlets and form contracts which stated that employees reviewed certain safety material.

13. As a result of this change in safety "training," Defendant and its agents would use arbitrary, negligible violations of the terms set forth in these manuals to terminate employees.

14. This pattern of termination was used disproportionately on employees of color, specifically African Americans or individuals Defendant believed were of African descent, including Mr. Williams.

15. For example, Mr. Williams' previous supervisor, Alec Gillis, was fired for negligible safety violations by the employees whom he supervised.

16. Other employees of African descent who suffered similar discriminatory employment issues at the hands of Defendant include, but are not limited to, Terr Davis, Jerome McMillon, and Terry Leverette.

17. One particularly egregious example of Defendant's policy occurred when Defendant's agents gave write-ups only to particular employees if they did not have a safety clip holding up their sleeves.

18. However, other employees who are not members of a protected class are still employed with Defendant and have received no write-ups despite violating the same rules and safety guidelines noted above.

19. Moreover, other employees who are not members of a protected class suffered no negative employment actions despite violating the same rules and safety guidelines noted above after violating objectively more serious safety guidelines or causing Defendant to lose thousands of dollars.

20. On May 25, 2016, Mr. Klein approached Mr. Williams accusing him of breaking a safety violation for not having the proper six-inch barrier between a hot piece of metal and his hand.

21. Mr. Williams attempted to explain to Mr. Klein that his hand was above the six-inch mark necessary and proper to guide the hot metal to its proper location.

22. Mr. Williams further inquired how Mr. Klein could see with such precision from upstairs, behind glass, and from 50 to 100 feet away from where Mr. Williams was working.

23. Mr. Klein refused to discuss the matter, and Mr. Williams received his second write-up in the then 21-year history of his employment.

24. On June 10, 2016, Mr. Williams was operating two machines by himself.

25. Mr. Williams observed Mr. Klein operating a machine that he was not supposed to be working on based on the collective bargaining agreement ("CBA").

26. Mr. Williams called one of his union representatives, Meryon Beydoun, and told Mr. Beydoun of Mr. Klein's infraction.

27. Mr. Beydoun contacted Mr. Klein and instructed him to stop violating the CBA.

28. Mr. Klein approached Mr. Williams with anger for reporting his infraction and began cursing at him.

29. Mr. Klein stated that, "[Mr. Williams] just [expletive] up," and that, "[Mr. Klein was] going to get [Mr. Williams] [expletive] up."

30. After this exchange, Mr. Klein ordered Mr. Williams to do the work in Mr. Klein's stead.

31. However, the job Mr. Klein instructed him to do was one that Mr. Williams did not regularly perform and was not trained to do.

32. This was also a machine with which Mr. Williams was not familiar and on which he had not been trained to work.

33. Mr. Williams informed Mr. Klein that he had not been trained on how to operate this specific machine, but Mr. Klein did not take Mr. Williams' comments into consideration nor did he change his direct order.

34. On June 13, 2016, Mr. Williams was ordered to report to HR regarding the incident that had taken place three days prior.

35. In this meeting, instead of focusing on the complaints Mr. Williams levied, the focus was on the conduct of Mr. Williams.

36. The vast majority of this meeting concerned ongoing allegations of racism from Mr. Williams relating to Mr. Klein.

37. Mr. Williams informed HR that there was currently a petition going around with many signatures of employees who would attest to the fact that Mr. Klein was racist.

38. Upon information and belief, the petition was still being circulated and discussed in hope of a change by the employees of color at the time of Mr. Williams' termination.

39. On or around February 7, 2017, Mr. Williams went to get a work mandated yearly physical.

40. Once there, Mr. Williams, who does not smoke, was accused of smelling like smoke and ordered to take a mandatory random drug test.

41. Upon information and belief, Mr. Williams was the only employee who was ordered to take this mandatory drug test.

42. When Mr. Williams asked if he could consult his union representative, Defendant's agents responded that no matter what, if he did not take the drug test, he would be fired.

43. There are no mandatory, random drug tests in Defendant's rules, regulations, or in the CBA.

44. Moreover, Mr. Williams was off of work on that day, and Defendant has no authority over his actions on his own time.

45. Mr. Williams contacted his union representative, and a steward had to drive to his location to stop the harassment in person.

46. While waiting outside for the discrepancy to be handled, a different agent of Defendant's approached Mr. Williams and said, "Oh you're one of those smart [expletive] guys."

47. On his next day back to work, Mr. Williams filed a union grievance related to the harassment centered around the discriminatory, attempted drug test.

48. On March 16, 2017, Supervisor Carlos Brown ordered Mr. Williams to use the same machine on which he was not trained to "re-grind" a roll that Mr. Williams had previously logged in the log book as needing to be reground at a later point, because the roll was below the specifications.

49. Despite never having been trained on the machine, Mr. Williams appeased his manager and put the roll in line with the correct specifications.

50. After regrinding the roll and measuring to ensure it met the appropriate specifications, Mr. Williams noted the new measurement in the log book.

51. Almost a week later, a union representative of Mr. Williams, Ms. Salaz, told Mr. Williams that she had been called into a labor relations meeting regarding Mr. Williams.

52. Ms. Salaz further told Mr. Williams that he was being accused of not regrinding the roll as his supervisor had instructed him to do.

53. About a week later, Mr. Williams was called in to give a statement about the incident, where he explained that he had done what he was asked to do by a supervisor.

54. In the meeting, Mr. Williams was asked if he had been trained on the correct specifications for the roll, and he informed HR that he had not been trained.

55. On or around March 30, 2017, after working an entire shift, Mr. Williams reported to the HR waiting room where Defendant's agents were holding a meeting regarding his employment status.

56. After reviewing the video of the day in question, Mr. Williams' statements were verified, as it could clearly be seen that he reground the roll as instructed and as he had informed Defendant.

57. However, because Defendant's agent could not see Mr. Williams on video making the measurement, it was assumed that he did not measure to specifications, which later formed the basis for Defendant's new theory of termination.

58. Important to note, Defendant never accused Mr. Williams of performing work outside of the specifications. Rather, its agents insisted only that the video did not show him measuring the roll to specifications.

59. In fact, upon information and belief, the roll was ground correctly and the actual roll at issue was never measured, audited, nor inspected.

60. After the meeting, Mr. Williams was given the option to sign a last chance waiver, which would allow the company to automatically fire him for any infraction. He was further informed that if he did not sign the last chance waiver he would be terminated.

61. Knowing that many ex-coworkers who had been fired for negligible incidents after signing this exact waiver, and that he had done nothing wrong, Mr. Williams refused to sign the document.

62. As a result, Defendant's agents took his badge and informed Mr. Williams that he was being terminated for falsifying company documents.

63. However, this changing justification for termination is obviously a pretextual basis for termination.

64. The facts and circumstances of the case show that Mr. Williams was actually terminated because of discriminatory reasons; specifically, his decision to participate in protected activity and his membership in a protected class.

65. Supporting his discrimination claims, the same supervisor – Mr. Klein – whom Mr. Williams had been advocating against because of his racist rhetoric and harassment, and about whom a petition had been circulated to have him removed from his job because of his racist tendencies – was one of only two supervisors to reprimand Mr. Williams in the previous ten years.

66. Defendant had already made the decision to terminate Mr. Klein without having first established the basis.

67. However, at most, Mr. Williams was fired for following the directions of his supervisor.

68. Even if Defendant's claims as to the reason for termination of Mr. Williams' were true, it is a negligible mistake, done without malice, which would not justify firing an employee of over twenty years.

69. On or about April 11, 2017, Mr. Williams filed a charge of discrimination with the Detroit office of the Equal Employment Opportunity Commission ("EEOC") on the basis of (1) race and (2) retaliation. **Exhibit A – Charge of Discrimination.**

70. The EEOC issued a Notice of Mr. Williams's Right to Sue, dated February 8, 2018. **Exhibit B – Right to Sue Notice**.

Mr. Williams requests relief as described in the Prayer for Relief below.

## COUNT I
## HARASSMENT-DISCRIMINATION ON THE BASIS OF PLAINTIFF'S RACE AND THE COLOR OF PLAINTIFF'S SKIN IN VIOLATION OF TITLE VII

71. Mr. Williams incorporates by reference all allegations in the proceeding paragraphs.

72. At all material times, Defendant was an employer covered by, and within the meaning of, Title VII of the Civil Rights Act of 1964 (Title VII), as amended.

73. Defendant's conduct, as alleged herein, violated Title VII of the Civil Rights Act of 1964, which makes it unlawful to harass or discriminate against an employee because of their race.

74. A respondeat superior relationship existed because Mr. Klein had the ability to undertake or recommend tangible decisions affecting Mr. Williams, and the authority to direct Mr. Williams' daily work activity as alleged in the statement of facts.

75. Mr. Williams, as an African-American, is a member of a protected class.

76. Employees of the same protected class as Mr. Williams are treated differently than non-African American employees during integral employment decisions.

77. Mr. Williams was, subjected to severe or pervasive harassment and discrimination, as alleged above and in the statement of facts, because of his race and color.

78. Defendant's unlawful actions were intentional, willful, malicious and/or done with reckless disregard for Mr. Williams' rights.

79. Mr. Williams notified Defendant of the unwelcomed conduct or communication, and Defendant failed to remedy the unwelcomed conduct or communication.

80. As a proximate result of Defendant's discrimination and harassment, Mr. Williams has suffered losses in compensation, earning capacity, humiliation, mental anguish, and emotional distress.

81. As a result of those actions and consequent harms, Mr. Williams has suffered such damages in an amount to be proven at trial.

Mr. Williams requests relief as described in the Prayer for Relief below

## COUNT II
## RETALIATION IN VIOLATION OF TITLE VII

82. Mr. Williams incorporates by reference all allegations in the proceeding paragraphs.

83. At all material times, Defendant was an employer covered by, and within the meaning of, Title VII of the Civil Rights Act of 1964 (Title VII), as amended.

84. Defendant's conduct, as alleged herein, violated Title VII of the Civil Rights Act of 1964, which makes it unlawful to harass or retaliate against an employee for engaging in protected activity.

85. A respondeat superior relationship existed because Mr. Klein had the ability to undertake or recommend tangible decisions affecting Mr. Williams, and the authority to direct Mr. Williams' daily work activity as alleged in the statement of facts.

86. Mr. Williams engaged in protected activity when he took the following actions, including but not limited to:

    a. Signed and circulated the petition being privately circulated by employees of color stating that their manager, Mr. Klein, was racist;
    b. Participated in the EEOC process, for himself, and previous ex- and current co-workers;
    c. Met with HR about the discrimination and harassment;
    d. Gave a personal statement to Defendant regarding Mr. Klein's racist tendencies;
    e. Filed a union grievance related to the harassment he received relating to Defendant's agents attempting to give him the only surprise drug test on his day off;
    f. Attempted to obtain proof of his and his fellow co-workers' adverse treatment.

87. Defendant, through its employees, had knowledge that Mr. Williams engaged in protected behavior, because, among other things, Mr. Williams reported each instance of racial discrimination and harassment and made multiple complaints to human resources.

88. Defendant and/or its agents took several adverse employment actions against Mr. Williams because of this activity, as alleged in the statement of facts and herein, including but not limited to Mr. Williams' ultimate termination from his employment of over twenty years

   for what amounts to, at worst, a negligible mistake.

89. But for Mr. Williams' participation in protected activity, Defendant would not have taken said adverse employment actions against Mr. Williams.

90. Defendant and its agents' unlawful actions were intentional, willful, malicious and/or done with reckless disregard for Mr. Williams's rights.

91. Mr. Williams notified Defendant and its agents of the unwelcomed conduct or communication and Defendant failed to remedy the unwelcomed conduct or communication.

92. As a proximate result of the Defendant retaliatory actions, Mr. Williams has suffered losses in compensation, earning capacity, humiliation, mental anguish, and emotional distress.

93. As a result of those actions and consequent harms, Mr. Williams has suffered such damages in an amount to be proved at trial.

94. Mr. Williams requests relief as described in the Prayer for Relief below.

**COUNT III**
**HARRASMENT-DISCRIMINATION ON THE BASIS OF PLAINTIFF'S RACE AND THE COLOR OF HIS SKIN IN VIOLATION OF THE ELLIOT-LARSEN CIVIL RIGHTS ACT ("ELCRA")**

95. Mr. Williams incorporates by reference all allegations in the proceeding paragraphs.

96. At all material times, Mr. Williams was an employee, and Defendant his employer covered by, and within the meaning of, the Michigan Elliott-Larsen Civil Rights Act, MCL 37.2101 et seq.

97. A respondeat superior relationship existed because Mr. Klein had the ability to undertake or recommend tangible decisions affecting Mr. Williams, and the authority to direct Mr. Williams' daily work activity as alleged in the statement of facts.

98. Mr. Williams, as an African-American, is a member of a protected class.

99. Mr. Williams was subjected to offensive communication or conduct on the basis of his membership in this protected class.

100. Defendant's conduct, as alleged more fully in the statement of facts, violated Michigan, Elliott-Larsen Civil Rights Act MCL 37.2101 et seq., which makes it unlawful to harass or discriminate against an employee because of that employee's race and or the color of their skin.

101. The communication and conduct was unwelcomed.

102. The unwelcomed conduct or communication was intended to or in fact did substantially interfere with the Mr. Williams' employment or created an intimidating, hostile, or offensive work environment as alleged in the statement of facts.

103. Mr. Williams notified Defendant of the unwelcomed conduct or communication and Defendant failed to remedy the unwelcomed conduct or communication.

104. As a direct and proximate result of the Defendants' wrongful acts and omissions, Mr. Williams has sustained loss of earnings, earning capacity, and fringe benefits and has suffered mental anguish, emotional distress, humiliation and embarrassment, and loss of professional reputation.

105. Mr. Williams requests relief as described in the Prayer for Relief below.

## COUNT IV
## RETALIATION IN VIOLATION OF ELCRA

106. Mr. Williams incorporates by reference all allegations in the proceeding paragraphs.

107. At all material times, Mr. Williams was an employee, and Defendant was an employer covered by, and within the meaning of, the ELCRA.

108. Defendant's conduct, as alleged herein, violated the ELCRA, which makes it unlawful to retaliate against an employee who has engaged in protected activity.

109. A respondeat superior relationship existed because Mr. Klein had the ability to undertake or recommend tangible decisions affecting Mr. Williams, and the authority to direct Mr. Williams' daily work activity as alleged in the statement of facts.

110. Mr. Williams engaged in protected activity when he took the following actions, including but not limited to:

    a. Signed and circulated the petition being privately circulated by employees of color stating that their manager, Mr. Klein, was racist;
    b. Participated in the EEOC process, for himself, and previous ex- and current co-workers;
    c. Met with HR about the discrimination and harassment;
    d. Gave a personal statement to Defendant regarding Mr. Klein's racist tendencies;
    e. Filed a union grievance related to the harassment he received relating to Defendant's agents attempting to give him the only surprise drug test on his day off;
    f. Attempted to obtain proof of his and his fellow co-workers' adverse treatment.

111. Defendant, through its employees, had knowledge that Mr. Williams engaged in protected behavior, because, among other things, Mr. Williams reported each instance of racial discrimination and harassment and made multiple complaints to human resources.

112. Defendant, and or Defendant's agents, took several adverse employment actions against Mr. Williams because of this activity, as alleged in the statement of facts and herein, including but not limited to Mr. Williams' ultimate termination from his employment of over twenty years for what amounts to, at worst, a negligible mistake.

113. But for Mr. Williams' participation in protected activity, Defendant would not have taken the adverse employment actions against Mr. Williams.

114. Defendant and its agents' unlawful actions were intentional, willful, malicious and/or done with reckless disregard for Mr. Williams' rights.

115. Mr. Williams notified Defendant and its agents of the unwelcomed conduct or communication and Defendant failed to remedy the unwelcomed conduct or

communication.

116. As a proximate result of Defendant Corporation's discriminatory actions, Mr. Williams has suffered losses in compensation, earning capacity, humiliation, mental anguish, and emotional distress.

117. As a result of those actions and consequent harms, Mr. Williams has suffered such damages in an amount to be proven at trial.

118. Mr. Williams requests relief as described in the Prayer for Relief below.

## COUNT V
### COMPENSATORY AND PUNITIVE DAMAGES FOR DISCHARGE IN BREACH OF COLLECTIVE BARGAINING AGREEMENT IN VIOLATION OF § 301 OF THE LABOR-MANAGEMENT RELATIONS ACT ("LMRA"), 29 U.S.C.A. § 185, ET AL

119. Mr. Williams incorporates by reference all allegations in the proceeding paragraphs.

120. Defendant is in an industry that affects commerce within the meaning of the LMRA.

121. This Court is the proper venue to hear this matter pursuant to 29 U.S.C. §185(a).

122. This Court has jurisdiction to hear this matter pursuant to 29 U.S.C. § 185(c).

123. Defendant negotiated with Mr. Williams' union who is a certified or recognized bargaining representative of which Mr. Williams is or was a member.

124. The Collective-Bargaining Agreement ("CBA") between Defendant Union and Defendant Corporation covers the unit of which Mr. Williams is or was a member.

125. Mr. Williams was discharged after his first reprimand, skipping all applicable steps, in direct violation of the CBA.

126. Defendant Corporation's normal day-to-day conduct was so far outside of the terms of the CBA, it should constitute repudiation and estoppel should operate to deny Defendant any rights contained therein because its conduct is so inconsistent with the same agreement it may seek to enforce.

127. Plaintiff has attempted to redress his rights via the CBA; however, those attempts have been futile due to fraud, deceit, and trickery of Defendant.

128. As a result, exhaustion was futile for Mr. Williams.

129. Mr. Williams requests relief as described in the Prayer for Relief below.

## COUNT VI
### COMPENSATORY DAMAGES TO RECOVER STRAIGHT COMPENSATION DUE UNDER THE CBA IN VIOLATION OF § 301 OF THE LMRA

130. Mr. Williams incorporates by reference all allegations in the proceeding paragraphs.

131. The CBA between Mr. William's union and Defendant covers the unit of which Mr. Williams is or was a member.

132. Per the CBA, Mr. Williams should not be fired for his first reprimand.

133. Per the CBA, Mr. Williams was prematurely and unjustly terminated.

134. Per the CBA, Mr. Williams is entitled to equal treatment by his employer.

135. Defendant terminated Mr. Williams to avoid paying him his higher wages that are based on his years of experience and because he adamantly stood up for his rights from within the same contract Defendant, presumably, is attempting to use as justification for his termination.

136. Mr. Williams requests relief as described in the Prayer for Relief below.

## COUNT VII
### HOSTILE WORKPLACE ENVIRONMENT IN VIOLATION OF TITLE VII

137. Mr. Williams incorporates by reference all allegations in the proceeding paragraphs.

138. At all material times, Defendant was an employer covered by, and within the meaning of, Title VII of the Civil Rights Act of 1964 (Title VII), as amended.

139. Defendant's conduct, as alleged herein, violated Title VII of the Civil Rights Act of 1964, which makes it unlawful to create a work environment that a reasonable person would

consider intimidating, hostile, or abusive.

140. A respondeat superior relationship existed because Mr. Klein had the ability to undertake or recommend tangible decisions affecting Mr. Williams, and the authority to direct Mr. Williams' daily work activity as alleged in the statement of facts.

141. Defendant's practice of using overbearing safety regulations as a basis for termination made every union employee essentially able to be fired at any time.

142. Coupled with, and in addition to the different treatment for employees of color, especially African American employees, made for a hostile workplace environment. African American employees were especially vulnerable to termination due to overproduction and underemployment.

143. Mr. Klein verbalized this threat when Mr. Williams told him to stop working on a bid machine.

144. Moreover, Defendant had a system of protection instilled for employees they liked and for management staff, making these groups, basically untouchable, and even worse, all of the complaints that Mr. Williams made counteractive to the cause of stopping the harassment and hostile workplace.

145. The communication and conduct was unwelcomed.

146. The unwelcomed conduct or communication was intended to or in fact did substantially interfere with the Mr. Williams's employment and created an intimidating, hostile, or offensive work environment, as alleged herein and in the statement of facts.

147. As a proximate result of the Defendants' discriminatory actions, Mr. Williams has suffered losses in compensation, earning capacity, humiliation, mental anguish, and emotional distress.

148. As a result of those actions and consequent harms, Mr. Williams has suffered such damages in an amount to be proven at trial.

149. Mr. Williams requests relief as described in the Prayer for Relief below.

## COUNT VIII
## HOSTILE WORKPLACE ENVIRONMENT IN VIOLATION OF THE ELCRA

150. Mr. Williams incorporates by reference all allegations in the proceeding paragraphs.

151. At all material times, Mr. Williams was an employee, and Defendant his employer covered by, and within the meaning of, the Michigan Elliott-Larsen Civil Rights Act, MCL 37.2101 et seq.

152. A respondeat superior relationship existed because Mr. Klein had the ability to undertake or recommend tangible decisions affecting Mr. Williams, and the authority to direct Mr. Williams's daily work activity as alleged in the statement of facts.

153. Defendant's practice of using overbearing safety regulations as a basis for termination made every union employee essentially able to be fired at any time.

154. Coupled with, and in addition to the different treatment for employees of color, especially African American Employees made for a hostile workplace environment.

155. Also, because of the manner in which Defendant conducted its business, there were countless safety violations on a daily basis which made African American employees vulnerable for targeting with the manner in which management chose to "enforce" said violations.

156. Mr. Williams suffered as a result of this individualized targeting at the hands of Mr. Klein.

157. Moreover, Defendant had a system of protection instilled for employees it favored and for management, which rendered these groups "untouchable," and even worse, made it impossible for Mr. Williams to escape harassment in the hostile work environment.

17

158. The communication and conduct was unwelcomed.

159. The unwelcomed conduct or communication was intended to or in fact did substantially interfere with the Mr. Williams' employment and created an intimidating, hostile, or offensive work environment, as alleged herein and in the statement of facts.

160. As a proximate result of the Defendants' discriminatory actions, Mr. Williams has suffered losses in compensation, earning capacity, humiliation, mental anguish, and emotional distress.

161. As a result of those actions and consequent harms, Mr. Williams has suffered such damages in an amount to be proven at trial.

162. Mr. Williams requests relief as described in the Prayer for Relief below.

## COUNT IX
## NEGLIGENT TRAINING, RETENTION, AND SUPERVISION

163. Mr. Williams incorporates by reference all allegations in the proceeding paragraphs.

164. Defendant owed a duty to properly train and supervise its employees so that the workplace is free from unnecessary discrimination and hazard.

165. Defendant breached this duty by not training its employees to work its proper machines.

166. Instead, Defendant chose to mandate that each employee sign form contracts every day relieving Defendant of liability.

167. Defendant and/or its agents knew or should have known that the employees could not review the individual contracts on a daily basis and understand those contracts.

168. Moreover, Defendant would force employees to work multiple machines at once.

169. These decisions placed Mr. Williams and his co-workers in extremely dangerous, hazardous, and hostile situations on a daily basis.

170. Mr. Williams' job of maintaining heavy machinery is an extremely dangerous job.

171. Defendant and its employees knew or reasonably should have known that the conduct described herein would, and did, proximately result in physical and emotional distress to Mr. Williams.

172. Mr. Williams notified Defendant of the unwelcomed conduct or communication and Defendant failed to remedy the unwelcomed conduct or communication.

173. At all relevant times, Defendant and its agents had the power, ability, authority, and duty to begin training their employees properly instead of handing them form contracts relieving them of liability and or hire more employees to handle the actual production necessity of the corporation.

174. As a proximate result of Defendant's negligence, Mr. Williams has suffered losses in compensation, earning capacity, humiliation, mental anguish, and emotional distress.

175. As a result of those actions and consequent harms, Mr. Williams has suffered such damages in an amount to be proven at trial.

176. Mr. Williams requests relief as described in the Prayer for Relief below.

## COUNT X
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

177. Mr. Williams incorporates by reference all allegations in the proceeding paragraphs.

178. Defendant's conduct as outlined above was intentional.

179. Defendant's conduct as outlined above was extreme, outrageous, and of such character as not to be tolerated by a civilized society.

180. Defendant's conduct as outlined above was of that that no reasonable person would be expected to reasonably endure.

181. Defendant's conduct as outlined above was for an ulterior motive or purpose.

182. Defendant's conduct resulted in severe and serious emotional distress.

183. As a direct and proximate result of Defendant's conduct, Mr. Williams has been damaged in the manner outlined above.

184. Mr. Williams requests relief as described in the Prayer for Relief below.

As such, Mr. Williams is entitled to relief as set forth below

## **RELIEF REQUESTED**

PLAINTIFF, ERIC WILLIAMS, respectfully requests that this honorable Court enter judgment against Defendants as follows:

1. compensatory damages in whatever amount above $75,000 to which Mr. Williams is entitled,

2. exemplary damages in whatever amount above $75,000 which Mr. Williams is entitled,

3. punitive damages in whatever amount above $75,000 which Mr. Williams is entitled,

4. an award of lost wages and the value of fringe benefits, past and future,

5. an award of interest, costs, and reasonable attorney fees, and

6. an order awarding whatever other equitable relief appears appropriate at the time of final judgment.

Dated: May 9, 2018

Respectfully Submitted,

*/s/ Connor B. Gallagher*
CARLA D. AIKENS P.C.
Carla D. Aikens (P69530)
Connor B. Gallagher (P82104)
*Attorneys for Plaintiff*
615 Griswold, Ste. 709
Detroit, MI 48226
connor@aikenslawfirm.com