UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ERIC WILLIAMS,

     Plaintiff,

                                 Civil Action No. 18-11485

v.

                                 HON. DENISE PAGE HOOD

AK STEEL CORPORATION,

     Defendant.

_____/

## ORDER GRANTING DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT [#20]

## I. INTRODUCTION

On May 9, 2018, Plaintiff Eric Williams filed a 10-count Complaint alleging that Defendant: (1) harassed and discriminated against him on the basis of his race and skin color, in violation of Title VII and the Michigan Elliot-Larsen Civil Rights Act ("ELCRA") (Counts I and III); (2) retaliated against Plaintiff in violation of Title VII and ELCRA (Counts II and IV); (3) breached the collective bargaining agreement in violation of § 301 of the Labor-Management Relations Act ("LMRA"), 29 U.S.C. § 185 *et seq.* (Counts V and VI); (4) created a hostile workplace environment in violation of Title VII and ELCRA (Counts VII and VIII); (5) negligently trained, retained, and supervised its employees (Count IX); and (6) intentionally inflicted

emotional distress upon Plaintiff (Count X).

On April 15, 2019, Defendant filed a Motion for Summary Judgment. [Dkt. No. 20] The Motion has been fully briefed.  For the reasons that follow, the Court grants the Motion for Summary Judgment.

## II.      STATEMENT OF FACTS

Plaintiff was hired by Defendant's predecessor-in-interest, Rouge Steel Company, on May 30, 1995.  His employment with Defendant commenced on September 16, 2014, when Defendant purchased the facility at which Plaintiff worked. At all relevant times, Plaintiff was represented by UAW Local 600.

In June 2012, Plaintiff began working in the PLTCM Roll Shop as an Operating Technician, and one of his jobs was being a material handler.  Material handlers have an array of duties, including but not limited to: servicing the mills for roll changes, building backup rolls, using the hi-lo to service supply trucks, handling the hot dip blind rolls, and servicing the hot strip mill with shims. Dkt. No. 24, Ex. B at 206.

Plaintiff indicates that the Operating Technician position included performing as a roll grinder, which is a distinct position in the roll shop from material handler, as the roll grinder position requires additional training to run certain machines. *Id*. at 206-207.  David Klein ("Klein"), Plaintiff's supervisor, referred to the position in which one grinds rolls as a "roll turn grinder." Dkt. No. 24, Ex. C at 11. Klein

described the roll turn grinder as a position in which an employee is responsible for "grinding rolls for the mill that meets specifications set forth by the mill." *Id.* at 12. Defendant has claimed that Plaintiff was trained how to grind rolls and subsequently take measurements, as set forth in work instructions.  However, as Plaintiff explained at his deposition, "they make everyone sign it before you enter [work]…[b]efore you go to work, they had these things out on the table and you sign them. So as far as having an actual class for this, no. This is a complete lie." See Dkt. No. 24, Ex. B at 70-71.

E-mails from Defendant's representatives show that Plaintiff claimed on multiple occasions that he did not know the proper grinding procedure and that, as of January 27, 2017, at least one of Defendant's managers (Carlos Brown) did not believe Plaintiff had been properly trained on how to grind rolls. Dkt. No. 24, Ex. D. Carlos Brown ("Brown"), an African-American who was one of Plaintiff's supervisors, stated:

> Tonight I basically suspended Eric Williams['] right to grind. . . . no one on this shift can work with him. He doesn't fully know how to change over the machines, he doesn't truly take pride in grinding, and I don't think he has been trained properly.  So I decided im [sic] not going to allow his lack of care affect the quality of the rolls that we provide to our customer.  Not on my watch any longer.  Along with his attitude, I don't think he and several with [sic] others have been properly trained to use the grinders. . . .

Dkt. No. 24, Ex. D.  Klein wrote in response: "Eric Williams auto response to

everything is he has not been properly trained. In all reality he has not properly paid attention." *Id.*  Klein also wrote, describing Neil Bishop ("Bishop"), a white employee who had "limited experience" grinding, that "[e]xperience was all he needed." *Id*. Plaintiff contends that Klein's words show that Plaintiff was being treated differently. When Defendant terminated Plaintiff (and as stated in its Motion for Summary Judgment), Defendant contended that Plaintiff was properly trained as a grinder.

Plaintiff admits, and Defendant's records reflect, that Plaintiff grinded rolls approximately 2-3 times per month out of need due to understaffing. Dkt. No. 24, Ex. B at 81.  Plaintiff sometimes had to operate two machines at once, against Defendant's standards. *Id.* at 94.  Plaintiff testified that he never received any formal training nor any direct instruction on how to grind rolls, *id.* at 63; 67; 70-71, and that he routinely informed his supervisors that he was not trained to work the grinding machines and did not know the proper procedure. *Id*. at 56-57.

Klein became Plaintiff's supervisor at some point prior to May 25, 2016. Before becoming Plaintiff's supervisor, a petition was circulated throughout the roll shop stating that Klein was racist and prejudiced and should not be a supervisor. Dkt. No. 24, Ex. B at 222. Plaintiff signed that petition.  On May 25, 2016,  Klein accused Plaintiff of a safety violation for not having the proper six-inch barrier between a hot piece of metal and his hand.  Klein either heard something or was already watching

4

Plaintiff from the supervisor's room about 40-50 feet away when he allegedly noticed Plaintiff touching a suspended load. Dkt. No. 24, Ex. C at 82. Plaintiff denied the accusation and indicated he was in the proper area at the time, but Klein insisted on writing-up Plaintiff.  Plaintiff claims that, "[s]hortly thereafter, Plaintiff, fed up with the harassment and dissimilar treatment, reported Dave Klein's racism, prejudice, and different treatment of white and black employees to labor relations." Citing Dkt. No. 24, Ex. B at 116-18.  However, when Plaintiff was asked at his deposition if he ever "went to labor relations to complain about Dave Klein?", he stated that he never went to labor relations to complain about Klein and only spoke to labor relations to defend himself. *Id.*

On or about June 10, 2016, Plaintiff reported Klein to the union for work on union machines by a non-union employee. Dkt. No. 24, Ex. E.  Later that day, Plaintiff confronted Klein while they were both outside on break, at which time an intense verbal altercation occurred.  Plaintiff told Klein that Plaintiff believed Klein was racist and prejudiced and was treating Plaintiff differently from other employees (something Plaintiff claims he also had done on or about May 25, 2016). *Id*.  Plaintiff testified Klein told Plaintiff to "text Neil that he [Klein] going to work the shit out of us for ratting him [Klein] out." Dkt. No. 24, Ex. B at 220.  Plaintiff testified that the altercation ended when Klein screamed at Plaintiff, "[n-word], I'm going to get you

5

fired." *Id*.  Although Plaintiff never complained to management that Klein was racist and prejudiced, Defendant's management presumably learned of that belief when Klein emailed his bosses (Jason Dearth and Donald Fowler) Plaintiff's allegations that Klein: (a) was racist and prejudiced, and (b) treated Plaintiff differently, on May 25, 2016 and June 10, 2016. *Id*.

Klein acknowledged that he was made aware of allegations regarding racial improprieties, but he did not know the timing of this. Klein states that he was never interviewed and never heard about the issue again, though he did not know the timing of this. Dkt. No. 24, Ex. C at 70-71.  Plaintiff testified regarding Klein, in part, as follows:

Q:     Okay. What makes you feel that he's "racist and prejudiced?"

A:     My opinion from working with him for 15 years. He calling me a [n-word]. Him treating black employees – him only writing up black employees. I seen him – he never wrote Neil up because he's European and stuff like that. Me and Neil was real close.  So I just – after seeing this happen for so many years – I had a incident where a truck came off one of my rolls. The same thing happened to Dave Klein. He never got wrote up for it.

And by me seeing all this stuff happen all the time, just give you a callous feeling towards management and people that's really in charge because only the black people getting wrote up.  While the Europeans getting passes all the time. Or maybe it's white privilege, or nepotism. I really don't know.  But how can I get wrote up for something Dave Klein did the same thing, but he don't get wrote up for it? …

* * * * *

6

A:   And he did[] call other people "N" words. He done talk about Carlos and
     Don [Fowler] talking about "Them [n-words] don't know what they
     doing.

                              * * * * *

Q:   Did you ever complain about any of these incidents –

A:   Yes.

Exhibit B at 112-16. Plaintiff testified that he saw Klein throw a pair of scissors at a

black employee, Ron Rhoades. *Id*. at 104. Plaintiff described Klein's "constant

barrage of harassment," *id*. at 127, and he explained the dissimilar treatment as

follows:

Q:   So you're claiming that white employees weren't written up by Dave
     Klein?

A:   Not --I never seen him write up one. And he might have wrote up one,
     but it was never on a – on a consistent battle [sic] as he wrote up black
     employees.

Q:   Which black employees, other than yourself, did Dave Klein write up?

A:   All of them. Let me see.  He harassed me, Mike Woods. He harassed
     Karl Osborne, Rom Rhoades, Roger Shultz, Neil Bishop, Andy Barton,
     James Finney. He really harassed James Finney a lot and all the black
     guys in the roll shop, like DJ, the guy who started the petition on Klein
     that say he was a – unfit to be a supervisor. All them started in OE. So
     I don't remember all the guys' names…

                              * * * * *

A.   . . . All I know is he harassed us and didn't harass the white guys.  Or if

                                     7

he harassed them, since they was buddies, they all been working together for 15 years, if they tell Dave to "go fuck off," it's all good.  But if I [did that], he try to write me up and harass me or get me to respect him because he a supervisor . . .

*Id*. at 129-30.

Plaintiff states that his situation was so dire that he attempted to bid out of the unit supervised by Klein, but "[Defendant] didn't grant me on my bid. They never accommodated me to get away from this person. It's like they set me up and kept me there until this eventual – I guess they called myself a – catching me in something…" *Id*. at 116-17.  Plaintiff felt he was being constantly scrutinized so that he could be terminated, which made for an unworkable and mentally stressful working environment.

For the few months after the June 10, 2016 incident and verbal altercation, Plaintiff believes he was extensively targeted by Klein. In August 2016, Klein wrote up Plaintiff (and two others, including Bishop) for the "failure to handle their basic job duties." Dkt. No. 24, Ex. F.  A verbal warning of a safety violation by Plaintiff was recorded and sent to only Klein.  In a January 27, 2017 email, Klein stated that Plaintiff's allegations of not being trained were a lie and that Plaintiff was the problem. Dkt. No. 24, Ex. D.  In February 2017, Klein wrote up Plaintiff (and Bishop) for excessive tardiness, and Klein also attempted to find Plaintiff's whereabouts or clock-in-time on other occasions in February and March 2017.  Dkt. No. 24, Ex. G.

8

On the night of March 16, 2017 and the morning of March 17, 2017, Plaintiff was asked to work two roll machines at the same time. On one of the rolls he had just ground (roll number 2000002), Plaintiff measured a low RA reading of .13, which was outside of the mandatory specifications ("spec") of .18-.24. Because the RA was below the specifications, Plaintiff marked the roll, roll number 2000002, as having an RA of .13 and also wrote next to that number "Low RA." Dkt. No. 24, Ex. M. Plaintiff's manager (Brown) requested that Plaintiff re-grind the roll, and Brown states that he confirmed with Plaintiff that Plaintiff had in fact re-ground the roll. Dkt. No. 20, Ex.10 at ¶5.  After he re-ground the roll, Plaintiff states that he measured the RA and wrote that the RA was now .18.  Plaintiff represents that he forgot to erase his original notation of "Low RA" next to the new .18 measurement.  Plaintiff left after his shift, and he had the next four days off.

On the morning of March 17, 2017, Fowler reviewed the roll sheet for the previous day. Dkt. No. 20, Ex.9 at ¶7.  He noticed that next to Roll #2000002, the RA was measured at 18 (which is within the required specifications), but there was a "Low RA" notation. Dkt. No. 20, Ex. 5. Fowler then directed Klein to measure Roll #200002 to determine its RA. Dkt. No. 20, Ex.9 at ¶8.  Klein did so and discovered the RA remained at 13, well below the required specification. Dkt. No. 20; Ex.11 at ¶6.  Fowler then measured the roll himself and confirmed the RA was 13. Dkt. No. 20,

Ex.9 at ¶ 9.  Fowler became concerned that Plaintiff had falsified the roll sheet and referred the matter to Defendant's Labor Relations Department. Dkt. No. 20, Ex.9 at ¶ 10.

When Plaintiff returned to work on March 22, 2017, he met with Mark Godau in Labor Relations. Dkt. No. 20, Ex. 6.  Plaintiff insisted he reground the roll at issue, measured the roll to ensure it was within specifications, and marked that it had an RA of 18. *Id.*  On March 24, 2017, Plaintiff was summoned to Fowler's office and asked why he did not reground the roll. Dkt. No. 24, Ex. B at 159. Plaintiff and his union representatives continued to insist that Williams performed all required steps, and that perhaps the issue was with the profilometer's calibration or that the managers measured incorrectly. Dkt. No. 20, Ex. 8 at ¶ 10; Ex. 9 at ¶11.  Plaintiff informed Fowler that Plaintiff had reground the roll and then Fowler accused him of lying. Dkt. No. 24, Ex. B at 159. Defendant then continued to investigate the incident.

As part of this continued investigation, Fowler reviewed video of the roll shop floor which showed Plaintiff working on Machine 408 the night of March 16. Dkt. No. 20, Ex. 9 at ¶12; Ex. 12.  Defendant states that the video demonstrated that during the course of his shift, Plaintiff did in fact regrind Roll #2000002 and ground three other rolls, as well. *Id.*   But, the video showed that Plaintiff did not take any of the required RA measurements on Roll #2000002, or any of the three other rolls he

ground that night. According to Defendant, on the last roll, not only did Plaintiff fail to take the required measurements, he did not even chalk the roll to check for surface defects. *Id.* Fowler shared relevant portions of the video with Godau and Patti Salaz, Plaintiff's union representative. Dkt. No. 20, Ex. 9 at ¶13.

A disciplinary meeting was then held on March 31, 2017 with Plaintiff, Godau, Fowler, Brown and Salaz. During the meeting, Plaintiff was confronted with this new information, and Plaintiff then claimed he did not take the measurements because he had not been properly trained to do so. Dkt. No. 20, Ex. 8 at Ex. A; Ex. 10 at ¶7; Ex. 9 at ¶ 14.  Brown told Plaintiff that if he had issues taking the RA readings, he could always reach out to him. Dkt. No. 20, Ex. 8 at Ex.A; Ex. 10 at ¶7.  Plaintiff responded to Brown by stating that Plainitff knew how to take an RA reading and could teach Brown how to do it. Dkt. No. 20, Ex.8 at Ex.A; Ex. 10 at ¶7.  At the end of the meeting, Plaintiff was terminated for falsification of company documents. Dkt. No. 20, Ex. 8 at Ex.A.  After the discharge decision, Labor Relations asked Defendant to preserve a copy of the video Fowler reviewed. Dkt. No. 20, Ex. 9 at ¶16.  When the video was copied from the original system, however, errors in the transfer caused a number of skips in portions of the recording. *Id*.

On March 24, 2017, a disciplinary hearing was held at which Plaintiff demanded to see: (1) the measurement of the roll in question that Defendant claimed

Plaintiff had not re-ground; (2) which profilometer was used to re-measure the RA score of the roll in question the following day; and (3) proof that the profilometer was properly calibrated when measuring the roll in question the following day. The disciplinary hearing was adjourned to March 31, 2017, so Plaintiff could be provided with the requested information.  On March 31, 2017, minutes before the disciplinary hearing was to commence, Plaintiff was told that he had to either sign a last chance waiver or be terminated. Dkt. No. 24, Ex. B at 173-74. This was the first time that Plaintiff had been accused of not measuring, and he was told that he had not reground the roll. *Id*.

Defendant claims that the situation was discussed with Plaintiff before deciding to terminate Plaintiff.  Plaintiff insists that he had been fired before he even entered the meeting, after he refused to sign a last chance waiver because signing the last chance waiver would have allowed Defendant to fire Plaintiff for any violation of any rule, no matter how negligible. Dkt. No. 24, Ex. B at 173-74. Plaintiff believes he had already been terminated when he declined to sign the last-chance waiver. *Id*.  In a March 23, 2017 e-mail from Jason Dearth, Dearth asked if Fowler and Klein had been keeping track of Plaintiff's tardiness. Dearth goes on to state that if they had kept track of Plaintiff's tardiness, "then he [Plainitff] should be on his way out for attendance also."  Dkt. No. 24, Ex. H (March 23, 2017 e-mail string of Defendant's

representatives).  Plaintiff suggests that the word "also" makes clear that as of March 23, 2017, Defendant had made its determination to terminate Plaintiff.

Fowler stated in a declaration that "[w]hen [he] watched the video in the system (prior to transferring it to DVD), the video did not skip and I watched it in its entirety." Dkt. No. 20, Ex. 8 at ¶ 12-13.  His e-mails from March 27, 2017 at 5:35 a.m. indicate that "I reviewed the low Ra roll in question on 3.16.2017, as well as the next roll on video. Although the video jumps several seconds at times. I was unable to see Eric Williams actually use the profilometer to check the Ra on either roll!!" Dkt. No. 24, Ex. I. Fowler's notes from his viewing of the video show that he did not keep track of every minute of that video. Dkt. No. 24, Ex. J.

The "skipping" video was the only video that Defendant apparently had during the pendency of its investigation to the present. In an e-mail from Mark Gadau, Defendant's Labor Relations Representative plainly states:

> [I]s there any way that we can get a  better copy of the video? This one skips around too much and that makes me uncomfortable. I noticed indents where it jumps ahead at least a minute in a few instances. From what I saw, I concur with Carlos' opinion that Eric didn't use the profilometer. But what I'm worried about is that the Union can claim that maybe Eric used it during one of the skips. Also is there any documentation to show roll 2000002's RA before Jeff Webb reground it? We need that to help prove our case. Please advise.

Dkt. No. 24, Ex. K.  The only video that existed at the time of Plaintiff's hearing was the video that skipped minutes at a time. Dkt. No. 24, Exs. I & J.  There is no

documentation that shows Plaintiff's roll was out of specification the following morning. Dkt. No. 24, Ex. K.

Klein testified that, "…[I]n the five years that I've been in management I think I've only filled out a few [disciplinary action forms]." Dkt. No. 24, Ex. C at 10. Plaintiff asserts that three of the disciplinary action forms Klein made (of the approximately five total he made) were for Plaintiff, two of which were in the five-month window after Plaintiff reported him in June 2016.  Klein states that he did not have any knowledge of Plaintiff's termination or process, Dkt. No. 24, Ex. C at 55, but an e-mail string referencing the events leading up to Plaintiff's termination indicated that "Dave Klein will be here tomorrow until 3:30 p.m. You can contact him at the following number." *Id*. Klein also admitted that he watched the time-skipped video of Plaintiff.

The video of Plaintiff's activity on March 16-17, 2017 demonstrates, without skipping, that Defendant did not measure at least three of the four rolls he ground that shift. Dkt. No. 20, Ex.12 at 11:03 p.m.-11:10 p.m.; 2:54 a.m.-3:03 a.m.; 4:18-4:40 a.m. As for the fourth roll, although the video recording skips a few seconds at a time, Defendant states that these brief lapses are immaterial because measurements using the profilometer take one to two minutes. Dkt. No. 20, Ex.2 at 19.  So, if Plaintiff did take measurements on this roll, the video could skip several seconds and still capture

at least some of the profilometer measurement activity, but Defendant is not seen using the profilometer at all. Dkt. No. 20, Ex. 2 at 19; Ex. 12.

The union filed a grievance on Plaintiff's behalf, which proceeded to arbitration in May of 2018. Dkt. No. 20, Ex.1 at 180. The arbitrator denied the grievance and upheld Williams' termination. *Id*. at 181. Plaintiff also filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on April 11, 2017 in which he alleged race discrimination and retaliation. Dkt. No. 1, Ex. A. On February 8, 2018, the EEOC issued a Notice of Right to Sue. Dkt. No. 1, Ex. B. Plaintiff initiated this lawsuit on May 9, 2018.

## III. LEGAL STANDARD

Rule 56(a) of the Rules of Civil Procedures provides that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The presence of factual disputes will preclude granting of summary judgment only if the disputes are genuine and concern material facts. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. Although the Court must view the motion in the light most favorable to the nonmoving party, where "the moving party has carried its

burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Summary judgment must be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. *Celotex Corp.*, 477 U.S. at 322-23. A court must look to the substantive law to identify which facts are material. *Anderson*, 477 U.S. at 248.

## IV. ANALYSIS

Plaintiff has identified four events evidencing how Defendant discriminated on the basis of race and retaliated against him: (a) the written warning he received for a May 25, 2016 safety violation; (b) a June 10, 2016 verbal argument between Plaintiff and Klein at which Klein called Plaintiff the n-word; (c) a February 7, 2017 request by a nurse at Defendant's clinic that Plaintiff submit to a drug screen; and (d) Plaintiff's March 31, 2017 termination.

### A. Time-Barred Claims

16

Defendant argues that any events that occurred prior to June 15, 2016 are time-barred for Title VII purposes. It is undisputed that Plaintiff filed with the Equal Employment Opportunity Commission ("EEOC") a complaint alleging discrimination and harassment on the basis of race and retaliation and instances of discrimination and retaliation that occurred within the 300 days prior to that filing are timely for purposes of Title VII. *Alexander v. Local 496*, 177 F.3d 394, 407 (6th Cir. 1999). For purposes of the discrimination and retaliation claims pursuant to Title VII, the May 25, 2016 and June 10, 2016 events are not considered.

The hostile workplace environment claim under Title VII and the ELCRA claims do not operate under the 300-day rule, however, and all of those claims are timely. *See, e.g., McFarland v. Henderson*, 307 F.3d 402, 408 (6th Cir 2002) (citing *AMTRAK v. Morgan*, 536 U.S. 401, 409 (2002)) (as long as one actionable instance of a hostile workplace environment is present within the 300-day window, conduct outside that 300-day window is also actionable); *Meek v. Michigan Bell Telephone Co.*, 193 Mich. App. 340,343 (1991) ("[t]he statute of limitations for ELCRA claims is the same three-year period applicable to personal injury actions….").

**B.     Race Discrimination and Harassment**

To establish a prima facie case of race discrimination or harassment under Title

VII or ELCRA,[1] a plaintiff must show that: (1) he is a member of a protected class; (2) he was qualified for the job and performed it satisfactorily; (3) despite his qualifications and performance, he suffered an adverse employment action; and (4) he was replaced by a person outside the protected class or was treated less favorably than a similarly situated individual outside of his protected class. *Laster v. City of Kalamazoo*, 746 F.3d 714, 727 (6th Cir. 2014); *Clayton v. Meijer, Inc.*, 281 F.3d 605, 610 (6th Cir. 2002).

Under both Title VII and ELCRA, a "plaintiff bringing a[n] . . . employment discrimination claim must present either direct evidence of discrimination, or circumstantial evidence that allows for an inference of discriminatory treatment." *Reeder v. City of Wayne*, 177 F.Supp.3d 1059, 1079 (E.D. Mich. 2016) (citing *Johnson v. Kroger Co.*, 319 F.3d 858, 864-65 (6th Cir. 2003)).

> When a plaintiff seeks to prove racial discrimination by circumstantial evidence, the court applies the *McDonnell Douglas* framework. First, a plaintiff must establish a prima facie case of discrimination by showing that: (1) she is a member of a protected class; (2) that she was qualified for the job and performed her duties satisfactorily; (3) that despite her qualifications and performance, she suffered an adverse employment action; and (4) that she was replaced by a person outside of the protected class or was treated less favorably than a similarly situated individual outside of the protected class. If a plaintiff establishes a prima facie case

---

[1]"Cases brought pursuant to the ELCRA are analyzed under the same evidentiary framework used in Title VII cases." *Humenny v. Genex Corp.*, 390 F.3d 901, 906 (6th Cir. 2004); *Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999). The Court addresses Plaintiff's Title VII and ELCRA claims simultaneously.

of discrimination, the burden then shifts to the defendant to "articulate
some legitimate, nondiscriminatory reason for the employee's rejection.

*Hawthorne-Burdine v. Oakland Univ.*, 158 F. Supp. 3d 586, 604 (E.D. Mich. 2016)

(internal citations omitted) (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S.

792, 802 (1973)).   "Throughout this burden shifting, '[t]he ultimate burden of

persuading the trier of fact that the defendant intentionally discriminated against the

plaintiff remains at all times with the plaintiff." *Reeves v. Sanderson Plumbing Prods.,*

*Inc.*, 530 U.S. 133, 143 (2000). "The plaintiff cannot rely purely on 'mere personal

belief, conjecture and speculation' as they are insufficient to support an inference of

discrimination." *Woythal v. Tex–Tenn Corp.*, 112 F.3d 243, 247 (6th Cir. 1997).

Once the defendant has articulated a legitimate, non-discriminatory reason for

its actions, the burden shifts back to the plaintiff to show the defendant's reason was

mere pretext for unlawful discrimination. *See, e.g., Braithwaite v. The Timken Co.*,

258 F.3d 488, 493 (6th Cir. 2001).  A plaintiff can establish pretext by showing: "(1)

that the proffered reasons had no basis in fact, (2) that the proffered reasons did not

actually motivate his [discipline], or (3) that they were insufficient to motivate

discharge." *Manzer v. Diamond Shamrock Chems Co.*, 29 F.3d 1078, 1084 (6th Cir.

1994).

Plaintiff argues that this is a direct evidence case, such that the burden-shifting

analysis of *McDonnell-Douglas* is unnecessary.  Plaintiff claims that the following

conduct by Klein show Klein harbored racial animus for African-Americans: (1) when Klein and Plaintiff argued on June 10, 2016 and Klein closed by saying, "I'm going to get you fired, [n-word]." Dkt. No. 24, Ex. B at 220; (2) Klein regularly called Carlos Brown and Don Fowler the n-word and stated that they did not know what they were doing; and (3) the petition that went around the shop and was signed by every employee except one that stated Klein was a racist, prejudiced, and should not be a supervisor.

Defendant counters that Plaintiff's arguments of direct evidence are misplaced. Defendant asserts that the June 10, 2016 statement by Klein to Plaintiff (using the n-word in stating that Klein would get Plaintiff fired) was first alleged at Plaintiff's deposition, three years after it allegedly happened.  Defendant argues that, even if Klein did call Plaintiff the n-word on June 10, 2016, it is not direct evidence that Plaintiff's discharge was an act of discrimination because Klein did not influence the discharge decision. Citing *Burke-Johnson v. VA*, 211 F. App'x 442, 451 (6th Cir. 2006) (allegations of racism "by persons who were not involved in the employment decision do not constitute direct evidence of discrimination").  Defendant contends that, as it relates to the event leading to Plaintiff's termination, Klein only re-measured Roll #2000002, which Fowler subsequently did as well. Dkt. No. 20, Ex. 9.

Defendant correctly notes that the alleged statements regarding Brown and

Fowler are inadmissible hearsay, as Plaintiff did not hear the statements, nor has anyone else testified that he or she heard Klein make such statements.  Defendant does not address Plaintiff's reliance on the petition circulated regarding Klein.

Defendant argues that Plaintiff cannot establish a prima facie case of discrimination with respect to his March 31, 2017 discharge because Plaintiff cannot identify any similarly-situated employees who were treated differently.  "Treated differently" would require a showing that another employee "failed to take RA and hardness measurement [but] not [get] disciplined or terminated."  Plaintiff admits that he does not know if: (a) supervisors saw another employee grind a roll but fail to take measurements, and (b) then allowed that employee to continue working. *Id*. at 251. Plaintiff has not identified any white employee who was not fired after falsely representing that he took required roll measurements when he did not do so.  Plaintiff did state that he saw both black and white employees perform grinding but fail to take measurements, *id*. at 250-52, which Defendant asserts rebukes Plaintiff's claim that he was treated differently on the basis of his race. Citing *Shah v. Gen. Elec. Co.*, 816 F.2d 264, 268 (6th Cir. 1987).

Defendant argues that it is entitled to summary judgment even if Plaintiff could establish a prima facie case because Defendant has offered a legitimate, non-discriminatory reason for the actions it took against Plaintiff (including his

21

termination) — that Plaintiff claimed he took certain required roll measurements when video evidence demonstrates that he did not do so. *Abbott*, 348 F.3d at 542. Defendant represents that it conducted a thorough investigation, re-measured the roll at issue (twice), held two individual meetings with Plaintiff, reviewed the video of the floor shop during the time Plaintiff was working on the roll on March 16-17, 2017, and held a disciplinary hearing. *Smith*, 155 F.3d at 806-07. Defendant states that it reviewed three continuous segments of the video that show Plaintiff grinding three rolls from start to finish without ever taking the required measurements. Dkt. No. 20, Ex. 12 at 11:03 – 11:10 p.m.; 2:54 – 3:03 a.m.; 4:18 – 4:40 a.m. Fowler and Godau state that they watched the video without any glitches, and Plaintiff took no roll measurements on that shift. Dkt. No. 26, Exs. 13 (at ¶2) and 14 (at ¶2).

Defendant asserts that the video shows Plaintiff grinding but does not show him making any measurements of those rolls. Defendant acknowledges that the video that has been reviewed in the course of this proceeding has a number of jumps or skips. But, Defendant asserts that Fowler (and Mark Godau) watched the video without any glitches before deciding to terminate Plaintiff. Defendant (and Fowler) state that they saw Plaintiff grind four rolls but not take any measurements on any of those four rolls. *See* Dkt. No. 20, Ex. 9 at ¶ 12. Defendant contends that Godau, Fowler, and Brown attested that Plaintiff's shifting explanations for the low RA at the disciplinary hearing

also undermine Plaintiff's claim that he measured the rolls on March 16-17, 2017.

Plaintiff asserts that pretext is shown in two ways.  First, Plaintiff claims that Defendant's proffered basis for terminating Plaintiff never happened.  Plaintiff states that he did grind and measure roll number 2000002, something that Defendant has not been able to disprove or refute by providing a video that does not skip.  Plaintiff states that it takes 30-40 seconds to measure the RA of a roll, so any review of a video that has gaps of time could not possibly be used to support Defendant's contention as to what actually occurred. Plaintiff argues that this evidence, which contradicts Fowler's affidavit, should, at the very least, create a question of fact for the jury as to Plaintiff's claim.

Second, Plaintiff contends that he has provided evidence that other employees outside of Plaintiff's protected class ("white and European employees") were not disciplined in any manner after engaging in substantially the same conduct for which Plaintiff was discharged. *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 349 (6th Cir. 2012).  Defendant challenges Plaintiff's contention regarding white employees being treated differently, as three emails attached as exhibits to Plaintiff's response brief show that Klein was simultaneously recommending discipline for Neil Bishop, a white employee. *See* Dkt. No. 24, Exs. F, G, and H; Dkt. No. 26, Ex. 15.

Defendant contends that Plaintiff cannot show that being asked to take a drug

screen during a February 7, 2017 visit to Defendant's health clinic: (a) constituted an adverse employment action, *DeJohn v. Tippman Group*, 2008 WL 2230194 (S.D. Ohio May 29, 2008); or (b) was motivated by Plaintiff's race.  Defendant notes that Plaintiff admitted he "[did]n't know why" the nurse requested the drug screen, though his Union Grievance indicates that the "attending nurse told him he needed to take a Drug and Alcohol Urine Test, for reasonable suspicion, claiming [Plaintiff] smelled like marijuna," and that "maybe [she] did smell some type of smoke . . ." Dkt. No. 20, Ex. 1 at 149-55; Ex. 7 at Ex. B.

Plaintiff stated he felt like the drug screen was requested based on his race, but his testimony does not support in any manner that the nurse requesting the drug screen was motivated by Plaintiff's race.  Plaintiff said the nurse told him that she smelled smoke and demanded that he take a drug screen. *Id*. at 150.  But, Plaintiff did not take the drug screen or get disciplined for not taking it. *Id.* at 151-52.

Plaintiff did not file an EEOC claim based on race discrimination, but he does include such allegations in his Complaint.  Plaintiff does not, however, offer any evidence (or even an argument) regarding how Defendant took any adverse action or engage in any conduct on the basis of the color of Plaintiff's skin.  Plaintiff did not address this issue in his response.

The Court dismisses Plaintiff's claim of discrimination on the basis of race.

## C.    Retaliation

"To establish a prima facie claim of retaliation, a plaintiff must show that: (1) she engaged in a protected activity; (2) this exercise of protected rights was known to the defendant; (3) the defendant thereafter took adverse employment action against the plaintiff... ; and (4) there was a causal connection between the protected activity and the adverse employment action....'" *Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307 at 320 (6th Cir. 2007); *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).[2] To survive the summary judgment stage, these elements do not need to be proven by a preponderance of the evidence, and many Sixth Circuit cases note that "the burden of establishing the prima facie retaliation case is easily met." *See, e.g., Singfield v. Akron Metro. Hous. Auth.*, 389 E3d 555, 563 (6th Cir. 2004).

Defendant claims that Plaintiff did not engage in protected activity.  Plaintiff "[s]igned and circulated the petition being privately circulated by employees of color stating that their manager, Mr. Klein, was racist."  Defendant argues that calling one's supervisor a racist is not protected activity as it does not allege the employer "is engaging in unlawful employment practice, but that one of its employees has a racial intolerance." *Roman v. Mich. Dept. of Human Servs.*, 2010 WL 11530616 *17, n.16

---

[2]"Once again, the ELCRA analysis is identical to the Title VII analysis," *Wasek v. Arrow Energy Servs.*, Inc. 682 F.3d 463, 472 (6th Cir. 2012), and both claims will be addressed simultaneously.

(E.D. Mich., July 20, 2010) (*rev'd on other grounds*, citation omitted).

Plaintiff states that he not only circulated the petition, he confronted Klein about the dissimilar treatment (he does not cite to the record or state when this happened), he refused to sign the last chance agreement,  and he made a "report of the petition & of David Klein's racism and prejudice to Labor Relations."  Plaintiff does not specify when he made any reports to labor relations, and he testified that he never went to labor relations to complain about Klein and only spoke to labor relations to defend himself. *See* Dkt. No. 24, Ex. B at 116-18.  Plaintiff states that he has direct evidence that "Klein told Neil Bishop that he was going to get Plaintiff back for ratting on him, and then, most importantly, and most egregiously, in the altercation outside of the roll shop in June 2016, David Klein yelled at Plaintiff, "n[-word] I'm going to get you fired.'" Dkt. No. 24, PgID 434.  But, unless Neil Bishop is going to testify that Klein told Bishop that Klein was going to get Plaintiff fired (and no deposition testimony of Neil Bishop has been submitted to the Court), the alleged statement by Bishop constitutes inadmissible hearsay.

Plaintiff participated in the EEOC process only after he was terminated, and he testified he never filed any other charges, Dkt. No. 20, Ex.1 at 23, so no retaliation was possible regarding that activity.  Plaintiff states that he met with Defendant's human resources department about the discrimination and harassment, but he has only

testified that he accused Klein of being racist and prejudiced. Plaintiff has not offered any evidence that he told any superior at Defendant of any comments or conduct by Klein to support that accusation. *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 288 (6th Cir. 2012); *see also, Booker*, 879 F.2d at 1313 (vague allegation of "ethocism" insufficient to constitute protected activity); *Roman*, 2010 WL 11530616, *17, n.16 (calling supervisor racist is not protected activity). Plaintiff's "personal statement to Defendant regarding Mr. Klein's racist tendencies" is similarly not protected activity because Plaintiff did not make any complaints to Defendant's representatives other than it was Plaintiff's opinion that Klein was racist.

Plaintiff's February 8, 2017 grievance over the attempted drug screen does not constitute protected activity, either, as the grievance is related to his alleged denial of union representation and does not mention race or any other characteristic protected by Title VII or Michigan law. Plaintiff admits that he had no reason to believe that the "harassment" he received relating to the drug test was based on race, and therefore the grievance he filed is not protected opposition to an unlawful act. *Johnson v. Univ. of Cincinnati*, 215 F.3d 561 (6th Cir. 2000) (Title VII protects retaliation for "opposing any practice that the employee reasonably believes to be a violation of Title VII."). Plaintiff also states that he "[a]ttempted to obtain proof of his or his fellow co-workers' adverse treatment," but he has not provided any evidence of these

attempts or that the decision-makers were aware of such attempts.

For the reasons set forth above, Plaintiff has not presented sufficient evidence to show that Defendant's conduct was sufficient to constitute protected activity under Title VII or ELCRA.  Defendant also contends that there is no causal connection between Plaintiff's complaints and the retaliatory conduct of Defendant (Plaintiff's termination). "To establish the causal connection that the forth prong requires, the plaintiff must produce sufficient evidence from which one could draw an inference that the employer would not have taken the adverse action against the plaintiff had the plaintiff not engaged in activity that Title VII protects." *Abbott*, 348 F.3d at 543. Defendant states that the most recent complaint made by Plaintiff was on June 13, 2016, over nine months prior to his termination on March 31, 2017.

The Court grants Defendant's motion for summary judgment on Plaintiff's retaliation claim.

## D.   Hostile Work Environment

Plaintiff has alleged a claim for hostile work environment, but Defendant argues that Plaintiff did not administratively exhaust this claim under Title VII because he only checked the "race" and "retaliation" boxes and did not offer any facts to support a hostile work environment claim. Citing *Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 362 (6th Cir. 2010) (a claim is not exhausted "unless allegations in the complaint

can be reasonably inferred from the facts alleged in the charge").   As Plaintiff correctly notes, there is not a box for hostile workplace environment, so there was no reason or ability for him to check such a box.  Plaintiff contends that he has shown facts to support his claim.

A plaintiff establishes a prima facie case of racial discrimination based upon a hostile work environment by showing that (1) the plaintiff was a member of a protected class; (2) the plaintiff was subjected to unwelcome harassment; (3) the harassment was race-based; (4) the harassment unreasonably interfered with the plaintiff's work performance by creating an environment that was intimidating, hostile, or offensive; and (5) the employer was liable for the harassing conduct.[3] *Nicholson v. City of Clarksville*, 530 F. App'x 434, 442 (6th Cir. 2013); *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 706 (6th Cir. 2007).

A plaintiff must, in essence, demonstrate that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal citations omitted).  The evidence related to hostile workplace environment is relevant only

---

[3]The evidentiary standards for Title VII and ELCRA harassment claims are the same, and these claims are addressed together. *In re Rodriguez*, 487 F.3d 1001, 1007 (6th Cir. 2007).

when Plaintiff is knowingly subject to that environment; if it occurred outside of Plaintiff's presence and he was unaware of it, the evidence is not relevant. *Abeita v. TransAmerica Mailings, Inc.*, 159 F.3d 246, 249 n.4 (6th Cir. 1998).

To satisfy the fourth element, "unreasonable interference," a plaintiff "must present evidence showing that under the 'totality of the circumstances' the harassment was 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Id.* at 707 (quoting Williams v. Gen. Motors Corp., 187 F.3d 553, 560, 562 (6th Cir.1999)). To satisfy the fifth element, "employer liability," a plaintiff must demonstrate "that [the plaintiff's] employer 'tolerated or condoned the [alleged conduct]' or 'that the employer knew or should have known of the alleged conduct and failed to take prompt remedial action.'" *Jackson v. Quanex Corp.*, 191 F.3d 647, 659 (6th Cir.1999) (quoting *Davis v. Monsanto Chem. Co.*, 858 F.2d 345, 349 (6th Cir.1988)).

Plaintiff identifies as evidence of the hostile workplace environment the May 25, 2016 safety incident and associated written warning, the June 10, 2016 argument with Klein when Klein used the n-word, and the February 7, 2017 encounter at Defendant's health services were the nurse requested that Plaintiff submit to a drug screen. As discussed above, however, Plaintiff has submitted no evidence that the May 25, 2016 safety incident and the February 7, 2017 requested drug screen were

based on race.  Klein's one-time use of the n-word is not severe or pervasive enough to create a hostile work environment. Citing *Nicholson v. City of Clarksville*, 530 F. App'x 434 (6th Cir. 2013) (four instances of racial slurs over the course of two years is not severe or pervasive); *Smith v. Leggett Wire Co.*, 220 F.3d 752, 760-61 (6th Cir. 2000) (incidents including a racial slur directed at plaintiff, a racially offensive and obscene cartoon circulated in the workplace, and references to black employees as "gorillas" were not severe or pervasive enough to constitute a hostile work environment); *Kelly v. Senior Centers, Inc.*, 169 F. App'x 432, 428-29 (6th Cir. 2000) (co-worker's repeated use of the n-word, even combined with other racist jokes and comments were deplorable but did not rise to level of a hostile work environment).

Defendant argues that it has exercised reasonable care to prevent and promptly correct harassing behavior and that, if Klein treated Plaintiff and other black employees as Plaintiff claims, Plaintiff unreasonably failed to take advantage of preventative or corrective opportunities provided by the employer. *Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 275 (6th Cir. 2009).  Defendant identifies its "thorough anti-harassment policy" (with its detailed reporting procedures) that is distributed to all employees, Dkt. No. 20, Ex. 7 at Ex. A, and notes that Plaintiff concedes that he never told anyone in Defendant's management that Klein had called Plaintiff the n-word, that Defendant otherwise engaged in the other incidents, or that

31

he believed any of the other incidents was race related. Dkt. No. 20, Ex. 1 at 118, 139; Ex. 7 at Ex. B.

Plaintiff claims that the working environment was different for black employees than it was for white employees under Klein, including his management co-workers (Fowler and Brown).  Plaintiff states that Klein threw scissors at a black employee once but was not written up and, even though the incident was reported, no investigation or corrective action was taken.

In support of his claims of a hostile work environment,[4] Williams repeats his unsupported suspicions of Klein's disparate discipline and mistreatment of other employees. Williams' suspicions of disparate treatment fail for reasons outlined above, and his generalized claims of "harassment" of other employees cannot serve as a basis for his own hostile work environment claim. *Abeita*, 159 F.3d at 249, n.4 (evidence of actions outside plaintiff's presence of which plaintiff was not aware at the time not relevant to hostile work environment or disparate treatment claims). As for his own experience, Williams offers nothing more than his claim (made for the first time three years after the fact) that during a June 10, 2016 argument, Klein called

---

[4]Plaintiff also asserts that he has a claim for retaliatory hostile workplace environment, but he did not raise this claim until filing his response.  Accordingly, the Court does not consider it. *Tucker v. Needletrades Employees*, 407 F.3d 784 (6th Cir. 2005).

him the n-word. While the single use of a racial epithet is unacceptable, as noted above, it does not rise to the level of creating a hostile work environment. *See Nicholson, Leggett Wire*; *Kelly v. Senior Centers, supra.*

The Court grants Defendants' motion for summary judgment on Plaintiff's hostile work environment claim.

## E.    Negligent Training, Retention, and Supervision

Plaintiff claims that Defendant failed to train its supervisors to prevent discrimination and failed to train him to perform as a roll grinder. Plaintiff did not respond to this argument. The Court dismisses Plaintiff's claim of negligent training, retention, and supervision by Defendant.

## F.    Section 301 of the LMRA

Defendant states that Plaintiff's Section 301 claim is fatally flawed in two ways: (1) Plaintiff did not bring an action against his union; and (2) the claim is time-barred. First, as the Sixth Circuit has recognized, "[t]he general rule in LMRA actions is that an individual employee has no standing to file an action against her employer without also filing suit against her union for breach of the CBA." *Aloisi v. Lockheed Martin Energy Sys., Inc.*, 321 F.3d 551, 558 (6th Cir. 2003) (internal citations omitted). There is no evidence Plaintiff ever filed suit against his union, so Plaintiff's Section 301 claim is subject to dismissal on this basis.

33

Second, any claim under Section 301 must be filed within six months of the underlying basis. *McCreedy v. AutoWorkers Local 971*, 809 F.2d 1232, 1236 (6th Cir. 1987). In this case, Plaintiff was terminated on March 31, 2017 but did not file the lawsuit until May 8, 2018. As the case was not filed until more than six months after the statute of limitations expired, Plaintiff's Section 301 claim also is subject to dismissal based on the expiration of the statute of limitations,

Plaintiff did not respond to this argument, and the Court dismisses Plaintiff's Section 301 claim.

## G.   Intentional Infliction of Emotional Distress

The elements of an intentional infliction of emotional distress ("IIED") claim are: (1) extreme and outrageous conduct; (2) intent or recklessness; (3) causation; and (4) severe emotional distress of Plaintiff. *See, e.g., Walsh v. Taylor*, 263 Mich.App. 68, 634 (2004); *Hilden v. Hurley Med. Ctr.*, 831 F.Supp.2d 1024, 1046 (E.D. Mich. 2011). Liability for IIED has been found only where the conduct in question has been so outrageous and extreme that it goes beyond every form of decency and is "regarded as atrocious and utterly intolerable in a civilized community." *Graham v. Ford*, 237 Mich.App. 670, 674 (1999). The test has been described as whether "the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" *Roberts v. Auto-Owners Ins. Co.*,

422 Mich. 594, 603 (1985).

Defendant contends that Plaintiff has not identified any extreme and outrageous conduct by Defendant or its employees, nor has Plaintiff submitted any evidence of severe emotional distress.  The Court agrees.  None of the actions by Defendant or its employees is "regarded as atrocious and utterly intolerable in a civilized community," such that lead the average member of the community to exclaim, "Outrageous!"  The only possible act that could fall within those parameters would be Klein calling Plaintiff the n-word while indicating that Klein would get Plaintiff fired.  Defendant argues:

> [B]oth state and federal courts in Michigan have repeatedly held as a matter of law that the termination of an individual's employment is not sufficiently outrageous to state a cause of action for intentional infliction of emotional distress.

*Scuderi v. Monumental Life Ins. Co.*, 344 F.Supp.2d 584, 606 (E.D. Mich. 2004). Defendant fails to acknowledge that the plaintiff in *Scuderi* was not a member of a protected class for which she was harassed or subjected to discipline or other challenging working conditions – she was simply fired.  Defendant also argues that even the telling of a racist joke of the day, the use of the n-word, and a threat to "tar and feather" plaintiff not truly outrageous for purposes of intentional infliction of emotional distress claim.  Citing *Garner v. Gerber Collision & Glass*, 2017 WL 3642192 (E.D. Mich. Aug. 24, 2017) (relying on *Roberts*, 422 Mich. at 603).

35

Plaintiff concedes that he has not been treated for any type of distress or emotional suffering, and he is not taking any medication as a result of the events that occurred that were associated with his employment by Defendant. Dkt. No. 20, Ex. 1 at 193-95. Plaintiff's testimony regarding his daughter's and wife's medical condition and issues do not constitute circumstances about which Defendant allegedly knew and terminated Plaintiff with the intent or recklessness to cause any severe emotional distress to Plaintiff.

The Court dismisses Plaintiff's claim of intentional infliction of emotional distress.

## H.    Cat's Paw Theory of Liability

Plaintiff contends that his cause of action should proceed under the cat's paw theory of liability.  As Plaintiff states, the U.S. Supreme Court held that employers may be held liable for adverse employment decisions that were proximately caused by a manager or supervisor who had an unlawful motive, even if the motives of the ultimate decisionmaker were not unlawful and the ultimate decisionmaker performed what can be characterized as an independent investigation. *Staub v. Proctor Hosp.*, 562 U.S. 411, 420, 131 S.Ct. 1186 (2011).  The issue is whether animus is a "motivating factor in the employer's action" when the official who makes the challenged decision "has no discriminatory animus but is influenced by previous

company action that is the product of a like animus in someone else. *Id.* at 1191.

Plaintiff contends that evidence of Klein's animus toward African-Americans, including Plaintiff, have seeped into the ultimate decisionmaker, even if he was not asked. Plaintiff cites Klein's January 27, 2017 email that states Plaintiff is a liar and does not pay attention, even though Klein's input was not sought. Dkt. No. 24, Ex. D. Plaintiff's reliance on the January 27, 2017 email is misplaced, as Klein was one of many persons to whom Carlos Brown set forth certain facts (some of which related to Plaintiff) and asked "What do you all think?" *Id.*

Plaintiff also suggests that Klein reacted after "Plaintiff reported him for his racial prejudice," but there is no evidence that Plaintiff reported Klein's alleged racial prejudice. The only evidence of any alleged racial prejudice that could have been communicated to management was Klein's emails indicating that Plaintiff accused Klein of being racist and prejudiced against Plaintiff.

The Court concludes that Plaintiff has not set forth evidence upon which a cat's paw theory of liability can proceed.

## V. CONCLUSION

Accordingly,

IT IS ORDERED that Defendant's Motion for Summary Judgment [Dkt. No. 20] is GRANTED.

IT IS FURTHER ORDERED that this case is DISMISSED with prejudice.

Judgment shall be entered accordingly.

IT IS ORDERED.

s/Denise Page Hood
DENISE PAGE HOOD
Dated: May 31, 2020                    UNITED STATES DISTRICT JUDGE